IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:12CR238 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | GOVERNMENT'S FINAL |
| | ) | SENTENCING MEMORANDUM |
| DOUGLAS L. WRIGHT, | ) | |
| BRANDON L. BAXTER, and | ) | |
| CONNOR C. STEVENS, | ) | |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through counsel, Steven M. Dettelbach,

United States Attorney, and Assistant U.S. Attorneys Duncan T. Brown and Justin E. Herdman,

and respectfully files its final pre-sentence report.  The Government argues that the Guideline

Ranges provided by this Court in its November 14, 2012, order are an appropriate and

considered application of the Sentencing Guidelines which have taken into account the specific

offense conduct of each defendant.  Moreover, the Government argues that the Court's order has

created a sentencing framework which reflects the considerations listed in 18 U.S.C. §3553 for

imposition of a sentence.  Specifically, the Government believes that the ranges set forth in the

order adequately satisfy the needs for determining a punishment that is sufficient, but not greater than necessary, while also providing reasonable variance in final imprisonment ranges to reflect the differing roles of each defendant.  In short, the Government is seeking sentences within the ranges provided by this Court because those ranges, pursuant to 18 U.S.C. §3553 (a)(1) and (a)(2), reasonably and adequately address the need for punishment while also addressing the circumstances for mitigation and aggravation not otherwise considered by the Guidelines.

For the reasons set forth for each individual defendant, the Government respectfully requests that the Court impose the following terms of imprisonment:

- Defendant Douglas Wright: 360 months incarceration, lifetime Post-Release Supervision, and $300 special assessment;

- Defendant Brandon Baxter: 300 months incarceration, lifetime Post-Release Supervision, and $300 special assessment;

- Defendant Connor Stevens: 228 months incarceration, lifetime Post-Release Supervision, and $300 special assessment.

## THE REQUESTED SENTENCES ARE CONSISTENT WITH SENTENCING PRECEDENT

The requirement of 18 U.S.C. §3553(a)(6) that the sentences imposed be consistent with similar crimes and similarly disposed defendants is certainly met by the Court's proposed Guideline calculation.  Despite these defendants' repeated assertions that this case falls outside the "heartland" of terrorism cases, the simple facts of this case clearly demonstrate that they are of one and the same with a series of recent cases charging attempted uses of weapons of mass destruction, namely explosive devices targeting civilian populations and government facilities. All of these cases bear the same hallmarks as the instant case.  Following a discussion of motivation and the defendants' independent selection of a target, an informant and/or an

2

undercover employee of the FBI provided the defendant with an explosive device.  The defendant then placed the explosive device at the intended target location and attempted to detonate the device, at which point the defendant was arrested.

In assessing this line of cases, there are only two differences presented by the case before this Court.  Unlike in many of the cases described below, defendants Wright, Baxter and Stevens were not solitary defendants who undertook their violent action as disaffected "lone wolves." Instead – and this is not a fact that inures to their benefit, as it clearly disperses any coercive effect posed by the CHS in this case – these three defendants worked together to plan, prepare, and ultimately attempt to destroy the Route 82 Bridge.  The second difference is merely one of kind – the defendants in the cases outlined below were all religiously-motivated jihadists.  That these three defendants were motivated by a hatred of government, rather than an expressed zeal for a particular faith, is not a factor taking the instant case out of the "heartland" of other attempted bombings.  To suggest otherwise, as the defendants have repeatedly done throughout this case, is to improperly argue to this Court that Wright, Baxter, and Stevens are somehow more deserving of a lenient sentence because they come from a different background, religion, and national origin than other similarly-situated defendants.

The first two of these cases – United States v. Finton (Case No. 10-CR-215; Southern District of Illinois) and United States v. Smadi (Case No. 09-CR-294; Northern District of Texas) – both resulted in guilty pleas to a charge identical to Count Two of the Indictment in this case, Attempted Use of a Weapon of Mass Destruction, in violation of 18 U.S.C. § 2332a(a)(2)(A).  The sentences for Finton and Smadi were, respectively, 336 months and 288 months' imprisonment.  Since that date, the government has successfully prosecuted a number of individuals for similar crimes, all of whom have received substantial sentences of imprisonment,

including: (i) United States v. Farooque Ahmed, Case No. 10-CR-413, Eastern District of Virginia; sentence of 276 months' imprisonment;[1] (ii) United States v. Antonio Martinez, a.k.a. Muhammad Hussain, Case No. 10-CR-798, District of Maryland; sentence of 300 months' imprisonment;[2] (iii) United States v. Amine Mohamed El-Khalifi, Case No. 12-CR-37, Eastern District of Virginia; sentence of 360 months' imprisonment.[3]

Indeed, the conduct in the instant case falls much more closely in line with the above, as they all involve the attempted use of explosives, than it does with United States v. Amawi, 695 F.3d 457 (6th Cir. 2012).[4]  Without undermining the serious nature of the criminal conduct on display in Amawi, the Sixth Circuit noted that the sentences imposed in that case did not create disparity, especially where the Amawi defendants never managed to obtain actual explosives, but only conspired to do so.  Unlike the Amawi defendants, these three defendants here – Wright, Baxter, and Stevens – not only obtained what they believed were actual explosives, but actually employed them against a civilian target and attempted to detonate them, leading to the possible loss of numerous innocent lives.

**DEFENDANT DOUGLAS WRIGHT**

Pursuant to 18 U.S.C. §3553(a)(1), the Court must impose a sentence that considers both the nature and circumstance of the offense, as well as the characteristics of the defendant; §3553(a)(2)(C) requires the sentencing court to also consider the risk of future dangerousness. Taken in tandem for this defendant, these factors weigh heavily for a sentence at or near the top

---

[1] Ahmed pleaded guilty to Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B, and Collecting Information to Assist in Planning a Terrorist Attack on a Transit Facility, in violation of 18 U.S.C. § 1992(a)(8).  These statutes carry a statutory maximum penalty of fifteen and twenty years, respectively.

[2] Martinez pleaded guilty to Attempted Use of Weapons of Mass Destruction, in violation of 18 U.S.C. § 2332a(a)(3).

[3] El-Khalifi pleaded guilty to Attempted Use of Weapons of Mass Destruction, in violation of 18 U.S.C. § 2332a(a).

[4] Undersigned counsel for the government are intimately familiar with the facts and circumstances of the Amawi case and can provide additional insight at the sentencing hearing on November 20, 2012.

of the range of 324-405 months, specifically 360 months.  However, as the Court recognized in

its order, there is some mitigation given the facts of the case, which is accounted for in a

sentence of 360 months.  In the case of Defendant Wright, however, that mitigation must be

minimal given the leadership role he played, his commitment to the plan, and his history of

violent criminal behavior.

### 1. Title 18, United States Code, Section 3553(a)(1) Nature and Circumstances of the Offense

Without deluging this Court with additional cites to transcripts oft-discussed, it is clear

that Defendant Wright's past behavior is entirely consistent with the conduct in this case to

which he admitted guilt, and clearly evince a future danger to society.  As the Court heard from

co-Defendant Anthony Hayne, and incorporated in its own Order, as early as mid-November,

2011, Defendant Wright was thinking of using explosives to take down structures.  In statements

to the FBI, and reaffirmed under oath, Defendant Hayne identified at least two conversations he

had with Defendant Wright about using and acquiring explosives.  Indeed, in his FBI statement,

Defendant Hayne stated that he felt as if Defendant Wright was giving him a "tutorial" in

explosives.  Likewise, later that year, Wright, in the presence of Defendants Baxter and Stevens,

asked Hayne if he could acquire explosives for them.  Both conversations, it must be

emphasized, were had without the CHS and long before Wright, Baxter, or Stevens discussed C-

4 with him.

Consistent with this fixation on explosives, Defendant Wright sought out alternative

means of acquiring them, from searching online to making them with a recipe from The

Anarchists Cookbook.  Ultimately, he was able to find a way to obtain explosives through the

CHS, after he revealed to the CHS that he wanted to do more than just peacefully protest.[5]  To speed his plan to fruition, Defendant Wright recruited every member of the group and developed most of the plans initially.  His selection of targets was deliberate and done with a purpose – to stop the flow of commerce and send a message to the government.  This behavior is consistent with his prior assault on a police officer and his expressed pride in sustaining injuries during protests for engaging in fights.

Likewise, his statement to Pre-Trial Services should not be fully credited.  Specifically, on the night he placed the devices, armed the devices, and ultimately repeatedly attempted to detonate the devices, Defendant Wright took what is best described as a flippant tone concerning the safety of others.  When asked about the cars on the bridge, he suggested that drivers should "drive fast if they feel something wobble."  Moreover, before retreating to a detonation site out of view of the bridge entirely, he wanted to drive over it, then detonate it, presumably so he could see it collapse in the rear view mirror.  After placing the devices, he agreed with Defendant Stevens that next time they should enlist the help of a structural engineer to ensure maximum damage and loss.  Such crassness is amplified by the fact that he told the FBI that the only reason he was present at the bridge was because an unidentified individual (notably not the CHS) was holding his ex-girlfriend and her family captive and his participation was the only way to ensure her safety.  Such a story is not only insultingly absurd, it is evidence that Defendant Wright sees his predicament as merely another situation in his life he must navigate through before he returns to his life of drug use and violence.

---

[5] Again, it must be emphasized that the CHS provided a means to acquire C-4 not as a means to "escalate" behavior, but rather, to ensure that Wright, Baxter, and Stevens did not try to make it themselves and,  in the process, endanger themselves and innocent people in their attempts.  At no time has the Government endorsed the image of any of these defendants lacking intelligence, however, Defendant Wright's constant and persistent desire to obtain explosives, and eager discussion of making them himself, created a need to control the acquisition of them.  Quite frankly, Defendant Wright was so eager to acquire and use explosives, public safety was put at risk if he attempted to make them or use them on his own.

### 2.  Title 18, United States Code, Section 3553(a)(1)
### History and Characteristics of the Defendant

Defendant Wright is a transient who left home; for most of the time between his leaving home and the instant arrest, he did not maintain significant ties to his home, instead opting to travel illegally by rail across the country.  As a result of his transient lifestyle he was arrested for trespassing on railroad property in 2007 and was observed at that time as possibly having a weapon.  In addition to this trespassing charge, the defendant has been convicted of petty theft in California, two counts of misdemeanor Aggravated Assault in Louisiana for an assault on a police officer, Criminal Possession of a Weapon in New York, for which he has an open warrant, and Unlawful Use of a Weapon to Intimidate Another in Washington State for threating a person with one of two knives he possessed during a fight.  Consistent with his status as homeless, the Defendant has no ties to this area.

### 3.  Title 18, United States Code, Section 3553(b)(2)(B)
### Adequate Deterrence

Unfortunately, even after accounting for his history and circumstances, the defendant is not uniquely situated.  There are literally thousands of disaffected young men and women who face similar challenges related to substance abuse, under-employment, failed educational goals, and difficult family circumstances. Some of those same individuals engage – as is fully their right under the laws of this nation – in peaceful political protest aimed at bettering their opportunities and outlook.  What cannot be countenanced, however, is a turn away from that Constitutionally-protected activity towards violent, terroristic action.  Only a substantial sentence of imprisonment – coupled with a lifetime term of post-release supervision – will provide adequate deterrence for other people contemplating politically-motivated acts of violence.

7

### 4. Title 18, United States Code, Section 3553(b)(2)(C)
### To Protect the Public from Further Crimes of the Defendant

Quite simply, there is nothing in Defendant Wright's past to suggest that he will not engage in future violent criminal activity and nothing in his conduct in this instant case to suggest otherwise.  Defendant Wright has made a history of glorifying violence and seeking out confrontation; he has allied himself with like-minded individuals, and even when presented with the opportunity to do good, has used that chance to engage in criminal activity.  He has a history of drug use without seeking rehabilitation and has chosen a solitary, self-destructive lifestyle over one which would add value to society.

## BRANDON BAXTER

### 1. Title 18, United States Code, Section 3553(a)(1)
### Nature and Circumstances of the Offense

The Court would be hard-pressed to find more serious crimes than those of which the defendants stand convicted.  The nature and circumstances of these offenses, along with Baxter's particular role in each, provide an irrefutable rationale to impose a sentence of 300 months, which is within this Court's calculated sentencing range under the U.S.S.G.  The evidence provided to this Court has amply demonstrated that for a period of not days, nor weeks, but months, Baxter was at the center of a conspiracy to conduct violent action against government facilities, financial institutions, and civilian transportation networks – all in the name of advancing an extremist anti-government and anti-corporate agenda.

The evidence provided to this Court indicates that prior to the entry of the CHS into the group, they were plotting to engage in violent action using explosives.  Co-defendant Anthony Hayne's testimony indicated that Baxter was among those interested in obtaining explosives in November 2011. (Transcript of Sentencing Hearing, 11/5/2012, PageID 2456-7).  This

conversation occurred well before Baxter's relationship with the CHS and could not be the product of anything other than an independent, personal desire to engage in violent activity.

From the outset of the conspiracy, Baxter's role was central to the ultimate target – the Route 82 Bridge – selected for sabotage by the conspirators.  Indeed, it was Baxter himself who first raised the suggestion of targeting a bridge.  On March 28, 2012, while driving over the bridge at the interchange at I-480 and I-77 (the Valley View Bridge), Baxter asked "How much [explosives] do we need to take out a bridge?"  In reference to the Valley View Bridge, Wright stated "This would be a good one" and Baxter followed by saying "It would be!"  This inquiry by defendant Baxter was made immediately following a discussion by Wright, Baxter, and the CHS about the perceived start of a "civil war" in Chicago during the joint G-8/NATO Summit in mid-May. After a discussion about the placement of explosives on the columns of a bridge, Baxter stated "You know that... that if we… that this… if this is some… this happens they're gonna make security on almost every bridge in the entire [expletive] country."

While in the midst of this developing conspiracy to target civilian infrastructure, Baxter and Wright continued to plan for violent action against law enforcement and military officials at the Chicago summit.  On March 28, 2012, Baxter was involved in the negotiations to purchase five bulletproof vests, five collapsible batons, and ten tear gas canisters.  He was insistent on purchasing "collapsible" batons, not larger billy clubs that could not be concealed.  The purchase of this equipment was negotiated at the same time that Baxter was eager to join with the "black block" at the G8/NATO Summit to be held in Chicago during May 2012, where Baxter fully expected the "black block" to "combat" the police.  Ultimately, the attack on the Route 82 Bridge was conducted to coincide with the May 1st nationwide strike and the upcoming G8/NATO Summit in Chicago.

Once the conspirators were aware that they could acquire C4 explosives, Baxter enthusiastically continued to suggest targeting government facilities for violent action. On April 1, immediately following a discussion by defendant Wright of targeting the Federal Reserve, Baxter stated "So I don't think anyone has ever done anything to [expletive] with the Fusion Center."[6]  When asked where the Fusion Centers were located, Baxter stated that the largest one is in Ohio.  Stevens then asked, "You talkin' about the DHS Fusion Centers?"[7]  After Baxter responded in the affirmative, Stevens then stated, "Hell yeah, man.  That would be a great [expletive] target."  Baxter and Stevens agreed that taking out the Fusion Center database would be difficult, but "monumental."

Of course, Baxter continued to play an instrumental role in the conspiracy through the evening of April 30, 2012.  He agreed on the selection of targets – first, a cargo ship, and then, finally, the Route 82 Bridge.  He was also engaged in the ultimate purchase of the IED's used on the night of April 30.  On the night of April 30, Baxter may not have actually detonated the explosives, but he clearly considered himself part of the overall conspiracy to target the bridge, stating on the drive away from the Route 82 Bridge "We just put C-4 under a bridge."

Perhaps most chilling, following his arrest, Baxter clearly articulated his motives for engaging in violent action against an undefended civilian target while expressing absolutely no remorse or regret.  Instead, he attempted to validate his violent actions through a radical, extremist justification.  At that time, he stated: "[O]ur politicians and most every aspect of our society are controlled by… large corporate empire… and they pay police off to get away with

---

[6] On March 28, 2012, Baxter observed a billboard for the Northeast Ohio Regional Fusion Center.  Baxter stated "I hate these things [Fusion Centers]."  Baxter then told Wright and the CHS that the Fusion Centers "came out shortly after the PATRIOT Act… and… they report to no one… They're a self-serving entity of the government."

[7] "DHS" is the United States Department of Homeland Security.

things and pay for politicians' campaigns and get their own people on regulation agencies and in our departments so that they do almost anything… [the United States is] under the rule of these, these large corporations… bombing all these different countries all over the place… it's all for money, it's all for money."  Baxter then stated with respect to the bombing of the Route 82 Bridge: "I don't see it as a protest.  Protesting is when you tell an institution you're upset with them… This was, um, this was an action… this, institutions don't listen."

### 2.  Title 18, United States Code, Section 3553(a)(1) History and Characteristics of the Defendant

There is nothing in Baxter's background indicating poverty, abuse or illness that would mitigate, in any way, his criminal behavior.  The evidence introduced to this Court indicates a supportive family core, consisting of a mother and father who, although divorced, still maintained a positive relationship with the defendant.  Despite his self-professed abuse of alcohol and drugs, the defendant was capable of working for a decent wage (making approximately $500/week for Working America).  He also apparently possessed significant social networking and computer skills that made him capable of living a productive and law-abiding life.  Of particular note, the defendant has apparently demonstrated a lack of willingness to follow through on rectifying those areas where he had identified a need for self-improvement – quite obviously in his lack of dedication to Alcoholics Anonymous.

Yet the defendant has also demonstrated a history of violent and anti-social behavior, including assaulting his stepfather with a weapon and continually carrying – in violation of a court order – a knife.  Most importantly, one of the letters submitted to the Court indicates that Baxter attended "non-violence" training as part of the Occupy Cleveland protest movement. (Letter from Don M. Bryant, PageID 2972).  That the defendant ultimately turned away from this training – indeed, away from the non-violent Occupy Cleveland movement as a whole – is a

factor in weighing the defendant's history and characteristics.  Contrary to the portrait the defendant and his supporters have attempted to paint, Baxter was clearly frustrated with the lack of progress made through non-violent political protest.  As he stated to FBI Special Agent Daniel Molina following his arrest, "I've been working with Occupy [Cleveland], and it's like I can't even get them to do anything that would upset people… disrupt traffic or do anything illegal." (Government Exhibit 12, at 14).

Thus, the history and characteristics of the defendant should be considered by this Court in light of his demonstrated fascination with anti-government invective, weapons, and politically-motivated violence.  To the extent that his background provides any mitigation whatsoever, the United States submits that they are adequately accounted for in reaching a sentence of 300 months' imprisonment – more than two full years less than the top of the Guidelines range as calculated by this Court.

### 3.  Title 18, United States Code, Section 3553(b)(2)(B) Adequate Deterrence

Unfortunately, even after accounting for his history and circumstances, the defendant is not uniquely situated.  There are literally thousands of disaffected young men and women who face similar challenges related to substance abuse, under-employment, failed educational goals, and difficult family circumstances. Some of those same individuals engage – as is fully their right under the laws of this nation – in peaceful political protest aimed at bettering their opportunities and outlook.  What cannot be countenanced, however, is a turn away from that Constitutionally-protected activity towards violent, terroristic action.  Only a substantial sentence of imprisonment – coupled with a lifetime term of post-release supervision – will provide adequate deterrence for other people contemplating politically-motivated acts of violence.

### 4.  Title 18, United States Code, Section 3553(b)(2)(C)
### To Protect the Public from Further Crimes of the Defendant

This is perhaps the single most important factor that this Court should consider as it determines whether or not to impose the sentence recommended by the United States.  As described above, Baxter has demonstrated a long-term, heartfelt, consistent, committed and serious desire to resort to violent action to influence government, corporations, institutions, and the civilian population.

Throughout the conspiracy, while discussing appropriate targets for violent action, Baxter repeatedly considered the possibility of civilian casualties and expressed, at best, a desire to minimize them.  This is not to say that Baxter was determined to eliminate the possibility of civilian casualties altogether; in fact, the likelihood of civilian death and injury seems to have been a calculated consequence of the violent action all along.  From the very start of the conspiracy's discussion about targeting a bridge, the certainty of civilian deaths was discussed by Wright and Baxter.  On March 28, 2012, after Baxter stated that targeting a bridge would result in heightened security, Wright declared that bringing down "the Detroit Bridge, that would kill a bunch of people… that would kill a bunch of people."  In response, Baxter's only concern was not that people would be killed, but that taking out the Detroit Bridge would be potentially problematic because "You don't wanna kill the people that [UI] like be on your side."  Wright then responded, "You don't want collateral damage."  Thus, from the very beginning, Baxter had considered the possibility of casualties and apparently approved, by inference, of the consequent death of individuals who were not on their side.

When discussing the Fusion Center, Baxter also conceded that casualties likely could not be avoided.  After the CHS asked how they would prevent casualties, Baxter expressed relative

indifference: "If there is not a period where there is no one working there, um, probably during the night, there's probably less people workin' there."

Finally, on the night of April 30, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Baxter asked, "How are we gonna make sure there's no cars on the bridge when it happens?"  Wright responded, "We can't."  Baxter then stated, "Okay."  This Court can be presented with no better evidence of Baxter's utter contempt for human life – there was no outrage, no expression of concern, no demand that protective measures be put in place.  Instead, by way of an incredibly nonchalant expression of agreement, Baxter assented to what was clearly understood to be the death of numerous civilians.[8]

Baxter's statements to this Court are equally disturbing and raise substantial question as to whether anything less than a very significant term of imprisonment can protect the public from the defendant's future crimes.  On two separate occasions, Baxter has testified in front of this Court.  Yet despite these several hours of testimony, Baxter has never expressed anything even approaching legitimate remorse, regret, or contrition for his violent actions.  Rather, Baxter has offered a veritable litany of excuses for his conduct, most of which center on the role of the CHS in this case.  Whether enticed by alcohol and drugs (the former of which there has been no evidence presented to this Court, the latter of which there is evidence of one lone prescription pill), the promise of employment (on four occasions for an amount less than what Baxter earned at Working America), or the hope of a free house for his father (who never even met the CHS), Baxter has repeatedly advanced the theory that he was unwillingly dragged into this conspiracy by a manipulative and nefarious CHS.  While the role of the CHS plays little relevance in the

---

[8] This fact is highlighted all the more by the subsequent comments of his co-conspirators.  Immediately following the statement of "Okay" by Baxter, Wright stated, "All they gotta, if they notice the bridge shakin', they better floor it, that's all I gotta say."  A few moments following that statement by Wright, Stevens stated, "Ain't that the [expletive] American dream, to get a [expletive] burger at Applebee's and blowing up [expletive]."

overall conduct at issue in this case, based on the above facts, it plays absolutely no role in determining whether this defendant poses a future risk to the public.  Baxter's actions are his own; sadly, he appears to be the person least convinced of this fact.  As a result, the defendant's outright insistence that he did nothing wrong – and his failure to adequately express any remorse for actions that could have resulted in the deaths of untold innocent civilians – are factors lending substantial weight to a sentence of 300 months' imprisonment.

In summary, this defendant has demonstrated commitment to his violent beliefs, has acted in furtherance of those beliefs, and has considered, and then accepted, the fact that those actions could have resulted in the death of people whose only crime was using a well-travelled bridge.  The United States respectfully submits that only a very significant jail sentence, as recommended by the Probation Office and the Guidelines calculated by this Court, will protect the public from the defendant.

**CONNOR STEVENS**

The Government argues that the Guideline of 188-235 months recognized by the Court is reasonable and satisfies the goals of 18 U.S.C. §3553; moreover, in calculating that range, the Court took pains to analyze the facts of the case and weigh them against the facts it viewed as mitigation.  Thus, the three-level departure, in addition to the two-level reduction for acceptance of responsibility, is a fair and reasonable representation of the case and application of the Guidelines.  As such, any further variances should be unnecessary.[9]  Based on the specific facts of the case, and given the ranges of the other defendants, the Government believes that a

---

[9] The Government urges this Court to discount the just-produced report by mitigation specialist John Fabian.  Dr. Fabian was not noticed by the defense; his report was produced for the first time today, and is not in conformity with the type of psychological exam required by 18 U.S.C. 4241 *et seq.*  At best, this report is an attempt to present to the Court information not properly obtained that is highly prejudicial and unable to be properly examined by the Government.

sentence of 228 months, or 19 years, is consistent with the other co-defendants and serves the interest of justice.

### 1.  Title 18, United States Code, Section 3553(a)(1) Nature and Circumstances of the Offense

The Court has offered a statement of facts that recognizes Defendant Stevens' connection, through Defendants Wright and Baxter, to the CHS.  The Court also adopts Defendant Hayne's testimony concerning the fact that Defendant Stevens was present for conversations between Wright, Baxter, Hayne and Stevens about obtaining explosives.  While much can be argued, and it is anticipated that defense will do so, about Defendant Stevens' equivocation at times to participate in the plot, the undeniable fact is that Connor Stevens freely chose to go to the bombing location, knew of the plot to destroy the bridge, helped arm the devices, and fully embraced the goals of the group.  And it must be noted, if the goal of the group was not a mere prank, as described by one defense attorney at an earlier proceeding in this matter, then the target of the defendants' angst would not matter in the least bit.  If the defendants' objectives were simply the result of a juvenile desire to blow something up, or to inject some element of jest into the act, then they could have chosen any rock, tree, or outhouse as the object of this pursuit.  Yet that is not what occurred here.  The defendants' actions were guided, informed, and calculated at every step of the way by a singular purpose – to intimidate and coerce the civilian population and the government of the United States and to retaliate against that same government for a variety of perceived ills. Accordingly, Defendant Stevens should not be allowed to mischaracterize the facts now at time of sentencing.

Moreover, Defendant Stevens, from his first inclusion in the group by Defendant Wright, knew of the group's intent because it was consistent with conversations he had with the other co-

defendants before meeting the CHS; simply, it was to obtain explosives.  Defendant Stevens knew of this plot when he discussed targets like the Fusion Center, the Federal Reserve, and his personal favorite, oil wells and mines.  Defendant Stevens knew of the plot when he offered suggestions about how to make mines to blow up cargo ships.  Defendant Stevens knew of the plot when he helped reconnoiter the eventual target of the Route 82 Bridge.

On April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Stevens stated, in front of the other defendants, "I am glad I came tonight."  Shortly thereafter, he bragged "We just committed the biggest act of, only act of terrorism, [UI] that I know in Cleveland since the 1960's."  Stevens then stated "The more I've been dealin' with [expletive] like this, the more I realize this like, Department of Homeland Security people, they've got their heads so far [expletive] up their [expletive]... it's so easy to run around them."

Defendant Stevens also talked with Defendant Wright about the need to enlist the help of a structural engineer for the next job, indicating that tonight would be a "good learning experience."  Finally, as if there was no doubt as to his intent, he declared that "Ain't that the [expletive] American dream, to get a [expletive] burger at Applebee's and blowing up [expletive]."

### 2.  Title 18, United States Code, Section 3553(b)(2)(B) Adequate Deterrence

Unfortunately, even after accounting for his history and circumstances, the defendant is not uniquely situated.  There are literally thousands of disaffected young men and women who face similar challenges related to substance abuse, under-employment, failed educational goals, and difficult family circumstances. Some of those same individuals engage – as is fully their right under the laws of this nation – in peaceful political protest aimed at bettering their

opportunities and outlook.  What cannot be countenanced, however, is a turn away from that Constitutionally-protected activity towards violent, terroristic action.  Only a substantial sentence of imprisonment – coupled with a lifetime term of post-release supervision – will provide adequate deterrence for other people contemplating politically-motivated acts of violence.

      **3.**   **Title 18, United States Code, Section 3553(a)(1)**
            **History and Characteristics of the Defendant;**
            **and**
            **Title 18, United States Code, Section 3553 (b)(2)(C)**
            **To Protect the Public from Further Crimes of the Defendant**

While talking of wearing suicide vests to blow up the Cuyahoga County Justice Center, Stevens stated, "My thing is that if you can survive the attack, like another day, then why, why not?"  This sentiment sheds light on Defendant Stevens' character and risk of future dangerousness.  Quite simply, as can be seen in his words and actions, Defendant Stevens has conducted himself to always look for a means to express his views through violence and criminal activity.

Much has been made by counsel and his family to this Court and in the media of Defendant Stevens' poetry.  Using an anti-psychotic drug as a pen name, he has published some poetry; it is interesting to note that the general tone of it is relevant to his offense conduct.  Using a broad-brush, the work is messianic and generally dystopian, taking the stance that the environment and society would be best served without organized government and reverting to a state of anarchy.  Here is a sampling of his work published online in December, 2011, at wordpress.com:

- Most disturbingly he writes of a character, with whom he identifies personally as a Beowulf-like character, fighting the police.  In one scene, Stevens writes of a pending confrontation with S.W.A.T. officers after the character orchestrates a major domestic

terror plot:  "The SWAT teams wouldn't normally care about f—ks like this, considering if they did they'd be better off nuking the city, but he was involved with a major terrorist group network working in solidarity through three cities.  The group had recently showed off it's [sic] power by simultaneously attacking the slums in all three cities, inciting them to riot for the next three days, resulting in 200 deaths;"[10]

- In "Cut-up" Stevens writes "Killing should be avoided whenever possible, as with all violence, and should be resented.  However, in the pursuit of Underground development and expansion of awareness it may be necessary.  We all act mechanically when the "right" grid is applied…Strike!  Strike!  Strike!"

- In "Armageddon"  he rails against the "Red, white and blue reich;"

- In "Blood-Shot Sight" he expresses a desire for "horns shouting in the streets through the rubble of the city. … The darkened flesh of the burnt corpses of untold myriads of faith and lies, placid eye aristocracies and one eyed false democracies;"

- In "Routine Subordinate Notice to All Spectators," he urges "Kill the Elite, Kill the Ruling Class.  We are the Criminal Class."

Throughout these writings, as well as those posted on the "Cleveland 5" website, Defendant Stevens openly identifies himself as an anarchist and a founder of a group – the United Student Front – whose goal was to "force the National Guard's hand."

That he writes of the United Student Front is important.  In high school, Defendant Stevens formed this group after sending harassing and threatening emails to U.S. Army recruiters who visited his school.  In addition to threatening the recruiters, he also posted on social media a call to "KILL COPS!  YEA, THE PIGS IN BLUE ARE THE FASCISTS WE HAVE TO

---

[10] The Government argues that this passage, given the timing of the talks about starting a "Civil War" at the G8 summit in Chicago, is more than mere coincidence.

FIGHT!!!!  LET'S F--K 'EM UP, LET'S ORGANIZE!!!  Kill a cop!  In struggle, Connor C.
Stevens," and to "drop acid on police stations."  Thus, it is clear from his writings from the time
of high school to the present his ideology has not changed, and his desire to act violently to bring
about such radical change still motivates him.

Finally, as noted above, Defendant Stevens saw the bombing as a learning experience,
and one for which they would not be caught because of his low perception of law enforcement's
ability.  In those statements, made among friends, he demonstrated none of the remorse or
confusion he now claims to have; when he thought no one was watching, he took pride in the
fact that he was partially responsible for what he thought would be the destruction of a bridge
and possible loss of life.

Taken as a whole, Defendant Stevens, while bereft of a lengthy criminal history, is
animated by a desire for violent and radical revolution.  Graphic images of murder, explosions,
war and torture populate his writings and, as is demonstrated in his participation in this plot,
incite his behavior.  Stevens was elated at what he thought the magnitude of the bridge bombing
would be, relating it to the "greatest act of terrorism since the 60's," and when viewed in context
of his writings, how it fit in his self-aggrandized role as a violent agent of change.  Simply, the
future dangerousness of Defendant Stevens is that he sees himself as a radical, that his role as a
radical can justify violence, and that as a radical, he specifically has a personal role to play in the
violent overthrow of the system; his behaviors to this point, his comments on tape, and his
writings all demonstrate that he believes he has a role in an inevitable and violent conflict with
the government.

Defendant Stevens is a young man filled with violence and hatred; he is also a young man

intelligent enough to be cautious and wary of strangers.  While that suspicion made him less of an active player in the planning of the bombing of the Route 82 Bridge, his ideological fervor drove him to ultimately continue with the plan to its end and revel in the hopes of additional future bombing.  The interests of society dictate that Defendant Stevens be removed from society for 19 years in recognition of this persistence for violence.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests the following sentences within the Guideline Range established by the Court be imposed:

- ■ Defendant Douglas Wright: 360 months incarceration, lifetime Post-Release Supervision, and $300 special assessment;

- ■ Defendant Brandon Baxter: 300 months incarceration, lifetime Post-Release Supervision, and $300 special assessment;

- ■ Defendant Connor Stevens: 228 months incarceration, lifetime Post-Release Supervision, and $300 special assessment.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By:      /s/ Duncan T. Brown
Duncan T. Brown
Justin E. Herdman
Assistant U.S. Attorneys
Reg. Nos. 3982931 (NY) / 0080418 (OH)
801 West Superior Avenue, Suite 400
Cleveland, Ohio  44113
Telephone Nos.:  (216) 622-3933/3965
Facsimile No.:  (216) 685-2378
E-Mail:  duncan.brown@usdoj.gov
justin.herdman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of November, 2012, a copy of the foregoing
Government's Final Sentencing Memorandum was filed electronically.  Notice of this filing will
be sent by operation of the Court's electronic filing system to all parties indicated on the
electronic filing receipt.  Parties may access this filing through the Court's system.

<u>s/ Duncan T. Brown</u>
Duncan T. Brown
Assistant United States Attorney